AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the

_____ District of _____

<table>
<tr><td>United States of America<br>v.</td><td>)<br>)<br>)<br>)<br>)<br>)<br>)</td><td>Case No.   3:25-mj-70173 MAG</td></tr>
<tr><td align="center">_____<br><i>Defendant(s)</i></td><td></td><td></td></tr>
</table>

**FILED**

Feb 12 2025

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ in the county of _____ in the

_____ District of _____ , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| | |

This criminal complaint is based on these facts:

❒ Continued on the attached sheet.

_____
*Complainant's signature*

Approved as to form . _____ /s/ _____ .
              AUSA Daniel N. Kassabian

_____
*Printed name and title*

Sworn to before me by telephone.

Date: _____

_____
*Judge's signature*

City and state: _____

_____
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR ARREST WARRANTS AND CRIMINAL COMPLAINT

I, Colin Hart, a Special Agent of the Drug Enforcement Administration ("DEA"), being duly sworn, state:

## INTRODUCTION

1.      I make this affidavit in support of an application for arrest warrants and criminal complaints charging:

      a.      Abahjit Singh BAL with 21 U.S.C. § 841(a)(1) and (b)(1)(B)(viii) based on his distribution of at least 50 grams of a mixture or substance containing methamphetamine on January 19, 2024; and

      b.      Teigue Ali BALINTON and Andrew Tarmizi BENSON with 21 U.S.C. § 841(a)(1) and (b)(1)(A)(viii) based on each of their distribution of at least 500 grams of a mixture or substance containing methamphetamine on May 10, 2024

all in San Francisco, California, in the Northern District of California.

2.      The facts in this affidavit come from my personal observations, my training and experience, information from records and databases, and information obtained from other agents and witnesses.  Where statements made by other individuals (including other Special Agents and law enforcement officers) are referenced in this Affidavit, such statements are described in sum and substance and in relevant part.  Similarly, where information contained in reports and other documents or records is referenced in this Affidavit, such information is also described in sum and substance and in relevant part.

3.      Because this affidavit is submitted for the limited purpose of establishing probable cause for a criminal complaint and arrest warrant, I have not included each and every fact known to me about this case.  Rather, I have set forth only the facts that I believe are necessary to support probable cause for a criminal complaint and arrest warrant.  My understanding of the facts and circumstances of the case may evolve as the investigation continues.

**AFFIANT BACKGROUND**

4.        I am a Special Agent ("SA") employed by the DEA and have been so employed since December 2019. I am currently assigned to the San Francisco Field Division. I am authorized and currently assigned to investigate violations of the Controlled Substance Act ("CSA"), Title 21 of the United States Code, and other violations of federal law.

5.        I am an "investigative or law enforcement officer of the United States" within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516.

6.        Prior to becoming a DEA Special Agent, I was a legal analyst with Verizon Wireless. In that capacity, I assessed and processed legal inquiries from various local, state, and federal law enforcement agencies. I also conducted cellular phone data extractions, real-time GEO tracking, and installed location tracking programs to assist in Verizon Wireless's mission to complement the emergency services requests of various law enforcement agencies across the country.

7.        During my employment with the DEA, I have received 19 weeks of full-time formalized education, training, and experience at the DEA Basic Agent Training Academy in Quantico, Virginia. This education, training, and experience included but was not limited to drug detection, drug interdiction, money laundering techniques, and schemes and investigation of individuals and organizations involving the smuggling, cultivation, manufacturing, and illicit trafficking of controlled substances. As a Special Agent, I have participated in multiple narcotics investigations. I have debriefed defendants, confidential sources, and witnesses who had personal knowledge regarding narcotics trafficking organizations, and conducted complex dark web and cryptocurrency investigations. I also have participated in many aspects of drug investigations including but not limited to telephone toll analysis, records research, and physical and electronic surveillance. I have participated in the execution of several federal search and arrest warrants that resulted in the arrest of suspects and seizure of narcotics. In addition, I have attended a training course regarding drug smuggling and interdiction.

8.      I have also had the opportunity to speak extensively with other experienced law enforcement officers and cooperating individuals about the packaging and preparation of narcotics, methods of operation, and security measures often employed by drug traffickers. I have examined documentation of various methods in which illicit drugs are smuggled, transported, and distributed. Throughout these investigations, I have also gained expertise in the use of a variety of law enforcement techniques, including the application and use of wire and electronic interceptions, confidential sources and undercover agents, surveillance techniques, and various other types of electronic techniques, such as body wires and transmitters. Additionally, I have gained knowledge and expertise in the use and analysis of data from pen register and trap-and-trace devices, toll records, traditional business records (including financial records and utility records) and non-traditional records kept by drug traffickers, such as pay-and-owe sheets documenting deliveries of, and payments for, narcotics. I have also gained knowledge and expertise in the collection and identification of drug evidence and the analysis and interpretation of taped conversations.

9.      Through my training, education, experience, and my conversations with other agents and officers who conduct drug investigations, I have become familiar with narcotics traffickers' use of mobile telephones and mobile telephone applications, Internet applications, social media applications, as well as narcotics traffickers' use of numerical codes and code words to conduct business. I have become familiar with narcotics traffickers' methods of operation, including, but not limited to, the manufacturing, distribution, storage, and transportation of narcotics, and the methods used by drug traffickers to collect, transport, safeguard, remit, and/or launder drug proceeds.

10.     Through my work and training to become a DEA Special Agent, I am also familiar with the manner in which narcotics traffickers use telephones, mobile telephones, coded communications or slang-filled telephone conversations, false or fictitious identities, and other means to facilitate their illegal activities and thwart law enforcement investigations. Based upon my training and experience, I know that it is common practice for narcotics traffickers to use telephones and/or mobile telephones in order to communicate with their customers, suppliers,

3

couriers, and other co-conspirators in order to insulate themselves from detection by law enforcement. Moreover, it is common for them to initiate such service under the name of an associate or fictitious name. Furthermore, it is common for narcotic traffickers to utilize false or incomplete address(s) while filling out subscriber information related to their cellular phone service in an effort to secret their illegal activities.

11.    I have had many discussions with other experienced law enforcement officers and have conducted, and been present at, many interviews of self-admitted narcotics traffickers and cooperating defendants concerning how drug traffickers and money launderers operate. I know that drug traffickers often hold proceeds traceable to their drug-trafficking activities in the form of United States currency, funds in bank accounts, high-value personal property items, and real property. But I also know drug traffickers are now increasingly holding drug-trafficking proceeds in virtual currency or cryptocurrency.

12.    Based on my training, research, education, and experience, I am familiar with the Dark Web and cryptocurrencies. I know that cryptocurrencies are different from traditional currencies in that cryptocurrencies are not issued by or backed by any government. In addition, cryptocurrency accounts and wallets are different from traditional bank accounts in that these accounts are held in digital format in one of any number of various types of digital wallets or exchanges. Likewise, cryptocurrency is accessible only by the account holder or someone who has access to the account password or account "recovery seed," a mnemonic passphrase made up of a series of random words, or in some circumstances, by the company hosting the virtual wallet containing the cryptocurrency. Account holders have the ability to send and receive cryptocurrency using a unique and complex wallet address, often referred to as the private key.

13.    In my training and experience, as well as my consultations with other Special Agents with whom I work, I am aware that individuals who reside in the United States who attempt to manufacture counterfeit prescription pills commonly obtain the necessary raw materials, active pharmaceutical ingredients, pharmaceutical manufacturing equipment and components from a foreign country.

14.    I know that many foreign sourced suppliers of raw materials, active pharmaceutical ingredients, pharmaceutical manufacturing equipment and components often require an active email address to place an order. The email addresses are commonly utilized by these suppliers to send order confirmations, payment information, and shipping tracking information.

## APPLICABLE STATUTES

15.    21 U.S.C. § 841(a) makes it a crime for any person to knowingly or intentionally distribute or possess with intent to distribute a controlled substance, including methamphetamine.

16.    21 U.S.C. § 841(b)(1)(A)(viii) specifies penalties for, inter alia, distribution of, or possession with intent to distribute, 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers.

17.    21 U.S.C. § 841(b)(1)(B(viii) specifies penalties for, inter alia, distribution of, or possession with intent to distribute, 50 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers.

## METHOD AND MEANS OF USING THE U.S. MAIL
## IN FURTHERNCE OF DRUG TRAFFICKING

18.    I am informed by a Postal Inspector that, over the past fifteen years, Postal Inspectors from the San Francisco Division have noticed the increased use of Priority Mail, Priority Mail Express, Express Mail, and registered mail to transport drugs and payments for drugs to and from Northern California. Based on my experience, training, and discussions with other law enforcement officers experienced in drug investigations, I know that drug dealers frequently use these services to ship controlled substances, including but not limited to: methamphetamine, cocaine, heroin, and marijuana. Use of these services is favored because of their reliability, speed, and low cost, as well as the perception that there is a minimal chance that the drugs will be detected. With regard to Express Mail and registered mail parcels, shippers pay for the benefit of being able to confirm the delivery of the parcel by checking the U.S. Postal Service internet website and/or calling the local post office.

19.    Based on my experience, training, and discussions with other law enforcement

officers experienced in drug investigations, I know that certain indicators are common when persons use the United States Mail to ship controlled substances from one location to another. Indicators for parcels that contain controlled substances and/or proceeds from controlled substances include, but are not limited to, the following:

       a.      It is common practice for shippers of controlled substances to use Express Mail, Priority Mail Express, and Priority Mail because the drugs arrive at their destination more quickly and on a predictable date. Express Mail, Priority Mail Express, and Priority Mail, when paired with a special service such as delivery confirmation, allow traffickers to monitor the progress of the shipment of controlled substances. Traffickers pay for the benefit of being able to confirm the delivery of the parcel by checking the U.S. Postal Service internet website and/or calling the local post office.

       b.      These packages often contain a fictitious return address, an incomplete return address, no return address, a return address that is the same as the addressee address, or a return address that does not match the place from which the parcel was mailed. These packages are also sometimes addressed to or from a commercial mail receiving agency (e.g., The UPS Store, formerly Mail Boxes Etc.). A shipper sometimes mails the parcel containing controlled substances from an area different from the return address on the parcel because either (1) the return address is fictitious; and/or (2) the shipper is attempting to conceal the actual location from which the parcel was mailed. The shippers often use fake business names or a person's name that doesn't associate with the listed return address. Shippers that mail-controlled substances through the US Postal Service oftentimes mail parcels with controlled substances in large volumes. These practices are used by narcotics traffickers to hide from law enforcement officials the true identity of the person(s) shipping and/or receiving the controlled substances.

       c.      Individuals involved in the trafficking of controlled substances through the United States Mail will send and receive mailings on a more frequent basis than a normal postal customer. Drug traffickers exhibit a higher rate of using expedited mail due to their

6

frequent exchanges of controlled substances and the proceeds from the sale of these controlled substances.

        d.      In order to conceal the distinctive smell of controlled substances from narcotics detector dogs, these packages tend to be wrapped excessively in bubble-pack and wrapping plastic, and are sometimes sealed with the use of tape around all seams. In addition, the parcels often contain other parcels which are carefully sealed to prevent the escape of odors. Perfumes, coffee, dryer sheets, tobacco, or other substances with strong odors are also used sometimes to mask the odor of the controlled substances being shipped. Recently, several parcels of interdicted mail have been found to contain heat/vacuum-sealed plastic baggies, and/or re-sealed cans containing controlled substances.

        e.      I know from my training, experience, and discussions with other law enforcement officers that controlled substances, proceeds from the sales of these controlled substances, and other indicia are likely to be found during parcel interdictions when some or all of the indicators referenced above are present.

20.     I know from my training, experience, and discussions with other law enforcement officers that drug traffickers who use the U.S. Mail and other carriers as a means of distributing controlled substances and as a means of communicating with co-conspirators often include the following in parcels relating to their trafficking activity, all of which are evidence, fruits, and/or instrumentalities of violations of 21 U.S.C. §§ 841(a), 843(b), and 846:

        a.      Controlled substances, including heroin, hashish, cocaine, methamphetamine, marijuana, and steroids;

        b.      Packaging, baggies, and cutting agents, including items used to conceal the odor of narcotics, such as perfumes, coffee, dryer sheets, tobacco, or other substances with a strong odor;

        c.      Records reflecting the mailing or receipt of packages through Express Mail, Priority Mail, Federal Express, UPS or any other common carrier;

      d.      United States and foreign currency, securities, precious metals, jewelry, stocks, and bonds;

      e.      Records reflecting or relating to the transporting, ordering, purchasing, and distribution of controlled substances, including books, receipts, notes, ledgers, pay and owe sheets, correspondence, and records noting price, quantity, date and times when controlled substances were purchased, possessed, transferred, distributed, sold, or concealed; and

      f.      Records reflecting or relating to co-conspirators, including personal notes, correspondence, cables, personal address lists, listings of telephone numbers, and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates and co-conspirators in controlled substances trafficking activities.

## STATEMENT OF PROBABLE CAUSE

### Overview of Investigation

21.      In January 2024 the DEA, United States Postal Investigation Service ("USPIS"), Homeland Security Investigations ("HSI"), and the Internal Revenue Service–Criminal Investigation ("IRS") opened a criminal investigation into the drug trafficking activities of a drug trafficking organization ("DTO") operating out of San Francisco, CA, and the DTO's members, including BAL, BALINGTON, and BENSON. The DTO was identified as a poly-drug DTO, selling a variety of narcotics throughout the United States via the United States Postal Service (USPS). During the course of the investigation, agents have seized several types of narcotics from DTO members, including: fake M30 pills pressed with fentanyl, fake Adderall pills pressed with fentanyl and methamphetamine, crystal methamphetamine, suspected fake Xanax pills, pills containing Alprazolam, and DMT.

22.      All packages mailed by the DTO and that agents inspected as part of this investigation, as noted herein, contained many of the attributes that I described above that were consistent with techniques used to obfuscate the package's sender, its recipient, and its contents, consistent with drug trafficking.  Those specific attributes that were present for all the mailed

packaged noted herein are:

        a.      The packages bore pre-printed labels with pre-paid postage. Persons mailing narcotics or narcotics proceeds through the mail will oftentimes use labels with pre-paid postage acquired by third party, online postage retailers in an effort to remain anonymous by not having the transaction tied to any credit/debit cards used in a face-to-face USPS retail transaction.  These methods allow persons mailing the packages to minimize the amount of time they spend in a post office and allow individuals to skip a face-to-face transaction by leaving the parcels on the counter for acceptance;

        b.      The packages listed a sender that was the name of a person or business that could not be found when searched for using reliable law enforcement databases, and were thus determined to be fictitious, thereby keeping the actual sender anonymous;

        c.      In many instances, the packages listed sender's return address information as an address in another state, and in many instances, the address used was a residential property for sale, thereby keeping the actual sender's address undisclosed;

        d.      The packages were sent by Priority Mail with a delivery confirmation number, which has a tracking service that allows the sender, recipient or anyone else with the tracking number to identify the packages' location in the mail stream. Tracking is important to persons involved in drug trafficking as a means to ensure narcotics or drug proceeds have made it to their destination and have proof in case a dispute occurs, since their operations aren't conducted face to face with buyers as in a traditional drug deal.

**On January 19, 2024, BAL Mailed 200 Grams Of Fake Adderall Pills Containing Methamphetamine And 54.4 Grams Of Fake M30 Pills Containing Fentanyl**

23.      On January 19, 2024, at approximately 12:13 PM, agents conducted surveillance at BAL's residence, and observed BAL's BMW parked in front of the residence. During surveillance, agents observed BAL, exit the lower front door of his residence, and enter the front driver door of his BMW. Agents conducted mobile surveillance and followed BAL, driving his BMW from his residence to the Westlake Post Office, 199 Southgate Avenue, Daly City, CA.

24.     At approximately 3:55 PM, agents observed BAL exit his BMW, retrieve a USPS mail tub full of parcels from the trunk, and walk into the Westlake Post Office carrying the USPS tub full of parcels. Agents then observed BAL exit the Westlake Post Office carrying an empty USPS mail tub, enter his BMW, and depart the area.

25.     Agents then went into the Westlake Post Office and located a USPS tub full of parcels that had been left by BAL on the counter for mailing. The USPS clerk working the counter stated that an individual had just dropped off the whole USPS tub full of parcels and no other parcels had been placed in the tub. There was a total of nineteen parcels in the tub. 18 of the 19 parcels mailed by BAL had the same return information (Sender name, address, zip code) as the parcels mailed by BAL at the Excelsior Post Office on January 12, 2024, with the city name being the only difference.

26.     I know from my training and experience that subjects involved in drug trafficking will often use fake names or business names in conjunction with addresses that don't associate to those names, to mail out parcels containing narcotics or narcotics proceeds in an effort to remain anonymous. Furthermore, I know from my training and experience that persons mailing narcotics or narcotics proceeds through the mail will oftentimes use labels with pre-paid postage acquired by third party, online postage retailers in an effort to remain anonymous by not having the transaction tied to any credit/debit cards used in a face-to-face USPS retail transaction. Furthermore, pre-paid postage labels allow individuals to minimize the amount of time they spend in a post office and allow individuals to skip a face-to-face transaction by leaving the parcels on the counter for acceptance.

27.     Agents and inspectors detained one of the 19 parcels for further investigation. On January 26, 2024, a federal search warrant was obtained to open one of those parcels. Upon its opening, agents and inspectors observed silver mylar foil containing two-clear vacuum-sealed bags containing pills. The first vacuum-sealed bag contained fake orange Adderall pills marked with "b 974" and "30." The second vacuum-sealed bag contained fake blue M30 pills with markings "M"

and "30." [1]

## On May 10, 2024, BALINTON Mailed 2,525.4 Grams Of Fake Adderall Pills Containing Methamphetamine, And Fake M30 Pills Containing Fentanyl, That BALINTON Received From BENSON

28.     On May 10, 2024, at approximately 8:30 AM, agents conducted surveillance at BALINTON's residence.

29.     At approximately 3:56 PM, agents observed BALINTON drive his Audi A4 (registered to his mother, who also lives at the same residence) out of the garage of his residence. Agents conducted mobile surveillance and followed BALINTON to the area of 1844 Irving Street, San Francisco, CA, where he parked his Audi A4. Agents observed BALINTON exit his Audi A4 and walk towards the south street corner of 20th Avenue and Irving Street.

30.      At approximately 4:13 PM, agents observed BENSON's Taurus parked on the street on the south street corner of 20th Avenue and Irving Street. Agents then observed BENSON greet BALINTON on the sidewalk near 1899 Irving Street and subsequently enter a near by restaurant. At approximately 4:28 PM, agents observed BALINTON and BENSON exit the restaurant, before entering their respective vehicles.

31.     Agents conducted mobile surveillance and followed both BALINTON and BENSON. Agents observed BALINTON park his Audi A4 on the street behind BENSON and TIJERINO's Taurus, approximately at 1386 20th Avenue, San Francisco, CA.

32.     At approximately 4:41 PM, agents observed the trunk of BALINTON's Audi A4 open, and BALINTON and BENSON standing outside the Audi A4. While BENSON and BALINTON stood outside their vehicles, agents observed BENSON retrieve two USPS mail tubs,

---

[1] DEA Western Region Laboratory's results of testing the fake Adderall pills confirmed that the pills contained methamphetamine, indicated a net weight of 200.0 grams and a pure methamphetamine weight of 2.8 grams, and consisted of 500 pills. The Laboratory's results of testing the fake M30 pills mailed by BAL confirmed that they contained fentanyl, indicated a net weight of 54.4 grams, and consisted of 504 pills.

11

full of parcels and envelopes, from BENSON's Taurus and hand them to BALINTON. Agents

then observed BALINTON place the two USPS mail tubs in the trunk of his Audi A4. Agents

observed BALINTON close the trunk of his Audi A4, enter the driver door, and depart the area.

Agents then observed BENSON enter the driver door of his Taurus and depart the area.

33.     Agents conducted mobile surveillance and followed BALINTON, driving his Audi

A4, and observed BALINTON park his Audi A4 on the street, approximately outside of 2362 28th

Avenue, San Francisco, CA. At approximately 4:55 PM, agents observed BALINTON exit his

Audi A4, retrieve two USPS mail tubs from the trunk of his vehicle, which appeared to be the

same two USPS mail tubs with the same contents therein that were handed to him by BENSON,

and walk into the Parkside Post Office, 1800 Taraval Street, San Francisco, CA.

34.     On the same day, agents reviewed CCTV video footage from the Parkside Post

Office. Based on review of the CCTV video footage, agents observed BALINTON, wearing a

facemask, a Cleveland Indians jacket in which he was seen earlier, and green pants, carrying two

USPS mail tubs containing multiple parcels, which appeared to be the same two USPS mail tubs

with the same contents therein that were handed to him by BENSON, enter the post office, place

the two USPS mail tubs on the service counter for mailing, retrieve two other USPS mail tubs that

were empty, and depart that post office.

35.     At approximately 4:56 PM, agents observed BALINTON exit the Parkside Post

Office carrying two empty USPS mail tubs, walk back to his Audi A4, and depart the area.

36.     Agents entered the Parkside Post Office and located two USPS tubs full of Priority

Mail parcels, which appeared to be the same two USPS mail tubs that BALINTON brought into

the Parkside Post Office and with the same contents therein that were handed to BALINTON by

BENSON. Agents located 39 USPS Priority Mail parcels comprising different sized boxes and

envelopes that were from those two USPS tubs. Agents and inspectors detained 3 of the 39 parcels

for further investigation.

37.     On May 16, 2024, a federal search warrant was obtained to open the 3 parcels.

Upon opening the first parcel, agents and inspectors observed paper packaging covering a clear

vacuum-sealed bag containing fake orange Adderall pills marked with "dp" and "30."[2]

38.     Upon opening the second parcel, agents and inspectors recovered a silver mylar bag containing clear vacuum-sealed bag containing fake orange Adderall pills marked with "dp" and "30."[3] The second parcel also contained a clear vacuum-sealed bag containing fake blue M30 pills marked with "M" and "30."[4] The second parcel also contained a clear vacuum-sealed bag containing 5 fake white Xanax pills.[5]

39.     Upon opening the third parcel, agents and inspectors recovered a silver mylar bag containing a clear vacuum-sealed bag containing fake orange Adderall pills marked with "b 974" and "30."[6]

## **REQUEST FOR SEALING OF APPLICATION/AFFIDAVIT, COMPLAINTS, AND ARREST WARRANTS**

40.     It is respectfully requested that this Court issue an order sealing, until further order of this Court, all papers submitted in support of this Application, including the Application/Affidavit, Criminal Complaints, Arrest Warrants, and Sealing Order, except that the Arrests Warrants may be unsealed after they have been executed.  Sealing is necessary because the

---

[2] DEA Western Laboratory results for the testing of the fake Adderall pills confirmed that the pills contained methamphetamine, indicated a net weight of 2,048.7 grams and a pure methamphetamine weight of 92.1 grams, and consisted of 5,201 pills.

[3] DEA Western Laboratory results for the testing of the fake Adderall pills confirmed that the pills contained methamphetamine, indicated a net weight of 436.6 grams and a pure methamphetamine weight of 17.4 grams, and consisted of 1,028 pills.

[4] DEA Western Laboratory results for the testing of the fake M30 pills confirmed that the pills contained fentanyl, indicated a net weight of .533 grams, and consisted of 5 pills.

[5] DEA Western Laboratory did not test the fake Xanax pills. They are being held at the Laboratory as evidence.

[6] DEA Western Laboratory results for the testing of the fake Adderall pills confirmed that they contained methamphetamine, indicated a net weight of 40.1 grams and a pure methamphetamine weight of 1.6 grams, and consisted of 98 pills.

Disclosure of the specified documents might jeopardize the defendants' arrest by alerting them of their pending arrest, thereby giving them an opportunity to flee.

## **CONCLUSION**

41.    Based on the information above, there is probable cause to believe that:

a.    Abahjit Singh BAL violated 21 U.S.C. § 841(a)(1) and (b)(1)(B)(viii) based on his distribution of at least 50 grams of a mixture or substance containing methamphetamine on January 19, 2024; and

b.    Teigue Ali BALINTON and Andrew Tarmizi BENSON violated 21 U.S.C. § 841(a)(1) and (b)(1)(A)(viii) based on each of their distribution of at least 500 grams of a mixture or substance containing methamphetamine on May 10, 2024.

Accordingly, I respectfully request that the Court issue criminal complaints and warrants for their arrest.

_____/s/_____

COLIN HART
Special Agent
Drug Enforcement Administration

Sworn to before me over the telephone and signed by me pursuant to Fed. R. Crim. P. 4.1 and 4(d) on this 11th day of February 2025. These applications and warrants are to be filed under seal.

_____
HONORABLE LAUREL BEELER
United States Magistrate Judge

2082-4313-8563, v. 1

14